## FIRST TEXAS PRUDENTIAL INS. CO. v. NUTE.

### No. 2724.

Court of Civil Appeals of Texas. El Paso. Oct. 27, 1932.

Rehearing Denied Nov. 10, 1932.

Turney, Burges, Culwell & Pollard and James F. Hulse, all of El Paso, for appellant.

Ponder S. Carter and C. L. Galloway, both of El Paso, for appellee.

WALTHALL, J.

On August 4, 1930, appellant insurance company, issued and delivered to Cora J. Nute, wife of appellee, Charles A. Nute, its policy of insurance upon her life in which appellee was named as beneficiary.

Appellee sued upon said policy, alleging the death of his wife, that he had furnished proof of loss, demand for payment, and failure to pay. The suit is for the face value of the policy plus statutory penalty and attorney fees.

As a defense, the appellant insurance company set up that in her written application for insurance the insured represented that she had never had heart disease; that said representation was false and material to the risk; that said policy of insurance provided that it was to be void and of no effect unless when said policy was delivered to insured and accepted she was in perfect health, free from infirmities or disease; that, at the time said policy was delivered the insured, she was suffering from heart disease; and therefore said policy never took effect.

The cause was tried without a jury, and, after hearing the evidence, judgment was rendered for appellee, from which this appeal is duly prosecuted.

### Opinion.

The trial court filed findings of fact and conclusions of law as follows:

"1. That defendant insurance company, in the course of an intensive canvass in the neighborhood in which the deceased lived called on her and secured her signature to an application for insurance.

"2. That the policy of insurance was issued and delivered to her by the agent of the company and, at the time of such delivery, she was in perfect health, although previously she had suffered ailments of a serious nature involving her heart, commonly called a leaky valve, caused from endocarditis; but at the time of the application for and issuance of the policy, there was no evidence of her suffering from this ailment and that she was up and engaged in her household duties.

"3. That chronic endocarditis caused an organic defect in the heart of the deceased, which was bound to have existed throughout the rest of her life, from December, 1929.

"4. That she had no intention of defrauding the company and allowed a life insurance policy on her life to lapse two or three months before her death for the sum of $1000.00.

"5. That she died approximately six months after the issuance of the policy sued on from a condition contributed to chronic endocarditis, which became active after the issuance of the policy.

"6. The attorney's fees, as agreed upon, were $200.00."

The court concluded that the representations in the application were correct in all material respects, and that the policy became effective upon delivery.

The only questions presented are as to the sufficiency of the evidence to sustain the court's finding that "at the time of such deliv-

ery (referring to the policy) she (referring to the insured) was in perfect health," and that "at the time of the application for an issuance of the policy there was no evidence of her suffering from this ailment (involving her heart), commonly called a leaky valve, caused from endocarditis." No finding was made or requested to be made as to any infirmity other than as above. On the part of appellant and briefly stated, it is to the effect: In answer to questions, Dr. Vernon S. Rogers, testified: He attended the insured in January and February, in 1928, and in September, October, and November, in 1929, and treated her for blood condition, a leaky valve, a physical structural organic condition of the heart, not a natural condition of the heart; she had what is called endocarditis, an infection along the heart valves, in the nature of a decomposition, an organic defect in the heart, a condition bound to have existed throughout the rest of her life. In answer to the question: "Is a person who has a heart such as you said she had, could she be said to be in perfect health?" To which witness answered: "Well, that will depend on what you mean by perfect health. A person could have that type of heart, and until such time comes as it is put under too much of a load, that person will feel in good health, but the organic defect remains there; whether it is inevitable that that heart is going to leak in such way that death will result, will depend upon whether the infection on those heart valves can be stopped; if it can be stopped the patient will remain in good health so long as the heart is not overtaxed." Witness saw the insured in December, 1930, but gave her no treatment. The "leaky valve" was the indirect cause of her death; the heart not being able to push the blood along, it leaked back and produced stagnation in the lung. The leaky heart is not necessarily fatal within itself. Numerous people who have leaky hearts die with some other malady. Witness did not hold an autopsy on the body of the insured. A blood clot might produce the same symptoms as a leaky heart. The symptoms are practically the same at the time of death.

Mrs. Edith Mallory, a daughter of deceased, testified: Lived adjoining her mother and knew when she received the policy; she and her mother were together practically all the time; is the only child and saw her mother off and on every day; never heard her complain very much; was present when she died; her mother stated she had been taking soda; witness usually gave her a little soda to relieve the gas; her mother worked around the house; had the "flu" often; at the time of her death she was sick about one and one-half hours.

The medical examiner's report of insured is in the record. By question and answers to the examiner, the following, in effect, is shown: Height, 5 feet and 4 inches; weight, 145 pounds; personal appearance as to health, good; detected no heart or lung disease, or disease of any kind; applicant never had any severe illness or injury; if so, it has not affected the constitution; home surroundings are sanitary; do not suspect intemperate habits or immoral life; examination made at home; no one present; applicant is well formed and healthy in appearance; menstrual functions are regular; married 20 years ago; two children; no miscarriage or difficulty in labor; no suspicion of uterine disorder; no disease of breast.

Under head of remarks, the following:

"I certify that I have this 14th day of July, 1930, personally seen and questioned the applicant at No. ——— street Cara, City of El Paso, and verified all the answers hereon, and am satisfied that I examined or inspected the same person whose signature appears on the reverse side hereof.

"I recommend the company to accept the risk for $590.00, my opinion being that applicant is first class risk for that amount.

"Approved for ——— by ———

"[Signed] Irving McNeil,
"Examiner's Signature."

The court found there was no fraud in procuring the policy; nothing to show the company's examiner of the insured was misled by the applicant. In such cases the rule seems to be well established that the medical examiner is an agent with limited powers, but his acts in and about the business intrusted to his care come within the same general rules of agency as to other special agents. Couch's Cyclopedia of Insurance Law, vol. 2, § 511; Joyce Law of Insurance (2d Ed.) vol. 1, § 412.

No question is made as to the admissibility of the examiner's report. Some criticism is made by appellant of the failure of the evidence to show who the examiner was, whether he was a medical expert or otherwise. The court could very fairly presume in the absence of any evidence to the contrary that the company's medical examiner was qualified to make the medical examination of the applicant, and report the facts included in his report as he found the facts to be, and correctly certify them to his principal.

There is no statement in Dr. Roger's statement that he at any time advised the insured that she had a leaky heart or advised her as to her condition; nor is there any evidence that on the day of the medical examination the insured knew that she was not in good health, if she was not; and what she said as to her health was but the expression of an opinion. National Life & Accident Ins. Co. v. Sumlar, 185 Ark. 1189, 51 S.W.(2d) 866.

We have concluded that the evidence was legally sufficient to sustain the trial court's finding and the judgment based thereon.

The case is affirmed.